Ms. Hayes. May it please the Court. Your Honor, Shannon Hayes, here on behalf of Sophia Lewis, individually, and as representative of the state of her son, Shimon Lewis. Your Honors, this is a Section 1983 excessive force case that arises out of the tragic death of Shimon Lewis, who on the day of his death was a physically healthy 24-year-old young man who was also a diagnosed schizophrenic. On the day that he was overcome by nine officers in one of the only rooms at the Dallas County Jail without cameras, Mr. Lewis's body revealed post-mortem that he suffered blunt force traumas throughout his body, bruising, crushing injuries that damaged his liver and kidneys, and that he suffered damage to his brain, including, according to the Parkland Medical Records, anoxic injury, which means that his brain was deprived of oxygen. What makes this case and this situation so unique is that we have no cameras in the room where all of this happened, and there's no eyewitnesses, Mr. Lewis's dad, to tell his mother what exactly happened, except for the two brave Dallas County employees that stood up and told the truth. Officer Tavera and Officer Sawyer, who both said during their investigative interviews that they were scared about their jobs when they did so. All that Shimon's mom has to allege is what we've obtained from the investigative report that was conducted by the Tarrant County Sheriff's Office after Mr. Lewis's death. The investigative report, as well as the transcriptions of the investigating officer's interviews pursuant to that investigation, make up the backbone of our allegations. Now, as this court knows, in excessive force cases, courts must consider the measured and ascending forces under the Kingsley factors, and in this case, the force ascended right to deadly force. The relationship between the need for force and the amount of force used weighs in our favor, because by her own affidavit, when Officer Grant walked into the room, she states in her affidavit that Mr. Lewis was already facedown with eight other officers around him, and she decided to put her full body weight on him. There was nothing measured about this force, there was nothing justifiable about this force, and there was nothing reasonable about this force. Moreover, the conduct alleged by Officer Grant was objectively unreasonable in light of the clearly established law at the time of the incident. Now, I'd like to quickly review the facts that we have before moving on to what I consider the heart of this appeal, which is the clearly established law prong of the analysis. We know that on September 22, 2022, Mr. Lewis was arrested for aggravated assault with a deadly weapon at 10.30 a.m., and he was booked into Dallas County Jail without incident. There's some evidence that his mother had contacted the authorities and made sure that they knew that he was a paranoid schizophrenic, and that the people at the Dallas County Jail knew that. In fact, the jail intake form reflects that they checked yes to history of mental illness and intellectual disability. Not only that, the jail intake form showed that it was recommended that he be expedited to be transferred over to the psych infirmary, or a suicide tank, or a crisis stabilization. Instead, what we know is over nearly 14 hours later, at 12.41 a.m. the following day, on September 23, we see camera footage of him coming out of the hallway with three detention service officers, and he is compliant. He is coherent. He is walking normally with them down the hall. They take him to a booking window. He stands there for a few more minutes, and then they disappear at 12.45 a.m. into this room without cameras. From there, what we know from the investigative report and the memos filed afterwards, according to Sergeant Christopher Lobedo, who was the sergeant in charge, Mr. Lewis refused to change into the prison clothes, said he didn't want to change his clothes, and curled up into a ball. He did not initiate any violent action. Mr. Lobedo made several attempts to place Lewis in a straight shoulder lock, and then called on six additional officers to come help him. So we have an unarmed, 175-pound, 5'8 young man, already with three detention service officers. We have six more that come. That's nine in total. Javier Tavira, Officer Tavira, a detention service officer who was present both before, during, and after the incident, witnessed Detention Service Officer Grant walk in and stand on Mr. Lewis's legs to hold him down in the change room and then move up above his buttocks to his back on his torso. This corresponds with the rhabdomyolysis that is indicated in the postmortem report, which is a crushing injury. Officer Tavira stated multiple times that Grant was standing on his legs with both of her feet, she was standing on him like she was on a surfboard, and that, again, she moved above his buttocks. While she was doing that, Mr. Lewis was saying, Why are you guys doing this to me? What are you doing to me? After handcuffing Mr. Lewis, the officers dragged him across the floor, cut his shirt off of him, pulled his clothes off of him, and forcibly put him in a six-point restraint chair. And then the next video footage we see is him coming out in the hall in this restraint chair, and everyone that's seen the video has said he has a marked acute mental status change. His head is rolling side to side. They take him to the medical assessment clinic where he says he can't breathe and asks for water. He takes a sip of water, his eyes roll back into his head, he becomes unconscious, and unfortunately he never wakes up. Six days later at Parkland, he's declared brain dead. The cause of death was listed as undetermined. Multiple people, including herself, told the officers from the Tarrant County Sheriff's Office that Officer Grant put her full body weight on him. In her initial interview on October 4th, she said that she sat on him three times. Now, she said she sat on the back of his legs and the back of his thighs. Officer Tavaro said that she was on the back of his legs and then she moved up to his back. She only changed her story during her second interview on October 7th when they asked her again about the allegations that Officer Tavaro had seen her put her full body weight on him. And then she changed it to, no, I was squatting over him and using my hands. But the Tarrant County Sheriff's investigators were not buying it. In fact, and I want to read from the report, they said, the position seemed difficult for her to maintain during the short duration of her demonstration. This led me to believe that Officer Grant could not have held this position for the duration of the use of force. They noted that her demeanor was argumentative and confrontational. The district court assumed she was on his back, though, didn't they, when they made that determination? If you read his opinion carefully, he says on the back of her legs, yeah. Officer Grant weighed 180 to 190 pounds. Now, first I want to point out that there's a disputed fact about whether or not he was passively or actively resisting. And in footnote four, they just kind of gloss over that. But again, in her own affidavit, Officer Grant talks about that when she came into the room, he was on the floor with his face down, just resisting one arm being handcuffed. And this court has repeatedly confirmed that subdued does not mean handcuffed. If the suspect lacks any means of evading custody, which he did, for example, by being pinned to the ground by multiple officers, force is not justified. So there's a disputed fact about whether or not he was actively resisting. In addition, the Fifth Circuit has consistently held that passive resistance involves actions that do not pose an immediate threat to the officers or others and do not involve aggressive or violent behavior. Again, there's no allegation. In fact, I'd like to point this out because it's not in the briefing, but in the record on pages 905 through 907, if you look at the state of Texas custodial death report, the answers to the questions asked there are very telling, kind of mirror the Kingsley factors. They say, at any time during the incident, did the decedent attempt to injure others? Answer, no. Did the decedent physically attempt to assault officers?  Verbally threaten officers? No. Attempt to gain possession of an officer's weapon? No. Gain possession of an officer's weapon? No. Did the decedent escape or attempt to escape custody? No. The only answer, yes, is to resisting being handcuffed. And again, he was a well-known paranoid schizophrenic. Now, under the Tupon Inquiry for Qualified Immunity, the trial court first decided that Officer Grant's conduct violated her 14th Amendment right, but then decided that we did not sufficiently establish a violation of a constitutional right that was clearly established at the time of violation. This court should reverse that ruling and remand for two reasons. The trial court erred by reading the clearly established law prong requirement too narrowly. The case we cited, Simpson v. Hines, it's a 1990 case, which is a seminal case on this, is strikingly similar to the facts. In fact, I don't know how they could be more similar in the way that the district court tried to distinguish them or not persuasive. In that case, it's actually less sympathetic for the plaintiff there than even here. He was brought in in a drug-induced state, put in the jail, and he— There was a neck hold in Simpson. I'm sorry? There was a neck hold in Simpson. There's also a neck hold in this. Sergeant Laboda said he tried to put him in a shoulder lock at the beginning, and we do have bruising on his shoulders. And so there's a neck hold in this one as well. He brandished marijuana. He kind of said, come and get it. So 10 officers versus 9 ran in. One held him in the neck hold like Sergeant Laboda said he attempted to do. Then they flipped him on the floor, and one, a guy named Beefcake, sat on his chest. And the district court said, we didn't have an allegation that she sat on his chest. Well, when you're prone face-down in all the hog-tying cases that this court has decided, you know, that is— you're even more prone when you're face-down for a positional hypoxia than when you're face-up. And lying face-down with someone, their full body weight on your back is— What is your best case for the proposition about the prone position cases? Well, there's a whole lot of them, and I would point to— a state of Aguillera lists those. It collects them. So does the Austin versus City of Pasadena case. But the state of Aguillera talks about that actually all the other circuits have done that too. They list a First Circuit, a Seventh Circuit, Tenth Circuit, and they— Are you holding this court's precedent in the Tempa case? Yes, I am. Is that case applicable here? Yes, ma'am. It is too, because he— Why wasn't he mentioned in any of your briefs? I do not know, Your Honor. That case, he was also suffering a mental incident and was put face-down, and the same thing. But this— That's the point of the case if I'm— It's correct. Yes, yes. I think—but I think Simpson v. Hines is the closest, and it's kind of the seminal case. It is the which case? The Simpson v. Hines case that we cite. It's kind of the seminal case holding this. And courts even—and I found in the— How does it feel with someone putting their body weight on his chest? What authority is there for us to put that on all fours with standing on someone's back? Well, in the state of Aguilera, this court cited it for officers cuffed his hands and legs behind his back, laid him on his stomach, and put pressure on his back, causing asphyxiation and death. But back versus chest is—you know, that's a distinction without a substantive difference, in my opinion. And in the state of Aguilera, they cite, like I said, from the First Circuit, the 7th and the 10th. In the First Circuit, they say that that case, the holding was exerting significant continued force on a person's back while that person is in a face-down prone position after being subdued or incapacitated constitutes excessive force. So there is clearly established law. In addition, this court has held that when a—that clearly established law and, you know, the touchstone of that is fair warning, that an individual has fair warning if their training or policies taught them that. Both Officer Tavera and Officer Sawyer said they had been trained not to stand on the detainees, and they knew that. So there's indication that she should have also known from her training beyond the scores of cases since 1990 that have had this holding. The court also stated there was no allegation that Officer Grant's action possibly caused asphyxiation, and that's not correct either. The Fifth Amendment complaint does allege that Mr. Lewis suffered severe anoxic brain injury, and that only occurs when the brain is deprived of oxygen. Asphyxiation is a direct cause of anoxic brain injury because asphyxiation is the process of depriving the brain of oxygen. And, again, as I pointed out, there's also an allegation of the crushing injury, which is rhabdomyolysis. We know that he was placed, again, face-down with the entire weight on him, and courts have defined positional hypoxia as resulting when a person is placed in that prone face-down position. The fact that the autopsy report listed his death as undetermined does not cut against this case either because the Darden and Gutierrez cases speak directly against that. If you recall, in Darden, the cause of death was listed as natural causes because he had a heart attack from the face-down position and tasing, but the court said this wouldn't have happened if they hadn't exerted that extreme and unreasonable force. And the same thing applies here. The appellees point out that there's no recording of screams like there was in Simpson. Well, there's no recording of anything, but we do have testimony that he was saying, what are you guys doing to me? Why are you doing to this? And in Simpson v. Hines, the guy was asking for them to lighten up and alternating that with threats, and Mr. Lewis didn't even do that. It does bear mentioning that this court in Darden, again, that's the case that they stated, that the violation of department policies in corresponding notice to officers is relevant in analyzing the reasonableness of a particular use of force under the totality of the circumstances. And, again, Sawyer and Taveras said their training was that you're not to stand on a detainee. And so she, in her affidavit, attests that she had received training from Dallas County. So hers could not have been different, Officer Grant's, from Officer Taveras and Officer Sawyer's. And my time is up. Thank you. Thank you. You've saved time for rebuttal. Mr. Ross. Mr. Ross. Good morning. May it please the Court. My name is Ed Voss, and I represent Officer Annette Grant in this case. And this court should affirm the district court's order and judgment because Officer Grant was entitled and is entitled to qualified immunity as a matter of law. Now, there are two other issues that were ruled upon by the district court. I'll just mention them in passing. That is that there was a finding by the district court that the bystander liability claim should be dismissed, and also the district court denied the motion for Rule 56D discovery in a summary judgment context. Those issues were not presented in Ms. Lewis's appeal, and I believe the court should affirm those two issues as well. The facts of the case, I think, are pretty well undisputed except for one thing. That is what happened in the room where there is no video. Ms. Grant was on duty. She answered an officer assist call at about 1245 a.m. on the 23rd of September. She didn't know Mr. Lewis at all, didn't know he was in jail. She was at a different location, and when they tried to change out his clothes into jail clothes, he resisted. She answered the officer assist call to come assist the other officers to control him, get him handcuffed so that he could be changed out. And so the undisputed evidence is that she left her other location. She went to the change-out room. She was in there about two and a half minutes. Her testimony is that she tried to get a hold of his legs, tried to stop Mr. Lewis's legs from moving around. She saw his left hand under his body. He was resisting being handcuffed. She assisted the other officers who were already there to get him handcuffed, and then once he was handcuffed, she left. She let go. She left the room. She didn't see anybody else use any force on Mr. Lewis after that time when she was handcuffed. So her time in the room was about two and a half minutes. She had no involvement with Mr. Lewis at any other time during his time in jail, either before or after the incident. I want to be sure that we're focused on Ms. Grant. Ms. Lewis's lawyer just talked about what all these other officers may have done and what they talked about they did, like Sergeant Laboda and those kinds of things. But this is an appeal only by Officer Grant and the grant of qualified immunity to her for what she did. It says that Ms. Grant's, Officer Grant's testimony about where she put her body weight and how much body weight she placed on, that she placed was? Mr. Lewis? No, Mr. Lewis? Well, to resolve that, the only evidence was by Officer Tavera saying that Officer Grant stood on his legs. Ms. Grant says, no, she didn't do that. But for the sake of . . . She was also above his buttocks? No, there was no testimony about that. Only as far as his buttocks, but not anywhere on his back. There's no testimony about that. She, of course, denies it. But to analyze qualified immunity, the district court said, okay, we'll remove that as a disputed fact and assume that even if that's what she did. The second point in qualified immunity is did it violate clearly established law? There is no case in the 14th Amendment context for a pretrial detainee situation that would guide Ms. Grant's actions in here other than what she did. Are you familiar with the Tempa case? I am familiar with it. Well, there's two reasons. One is Officer Dillard was on Mr. Tempa's back for about 14 minutes after he was subdued. There is no evidence here of that. Number two, that's a Fourth Amendment case. I believe that's a significant difference than our 14th Amendment pretrial detainee case. I would say that the only 14th Amendment pretrial detainee case that has been brought up by the other side and was analyzed by my response to it and in the briefing, but also by the district court, and that's the Simpson case. I would say that in the 14th pretrial detainee context, Simpson is unlike this case in multiple respects. I think the court's already pointed out there was, in Simpson, an issue with the officer who grabbed Mr. Simpson around the neck in a choke hold. Well, nowadays, that's not lawful and proper. And also, they brought in a 300-pound jailer whose name was Beef and had him sit on Mr. Simpson's chest. And the medical examiner in that case, despite what the other side is trying to diminish, the medical examiner in that case said that the cause of death in Simpson was damage to the neck and asphyxiation based on the pressure that was put on Mr. Simpson's chest during the struggle. I think it's really important here that the medical examiner examined Mr. Lewis. And the medical examiner noted that whatever body injuries there may have been were superficial and determined both the manner of death and the cause of death were undetermined. I mean, to me, that's significant because medical examiners are puzzle solvers. I believe that's what their job is, is to find an answer to the question what caused death. And I've been practicing in this area for quite a while, and I've never come across a case where the medical examiner said the cause of death was undetermined. So despite what the other side tries to say is minimizing that, I think it's significant because if the cause of death and the manner of death were undetermined, then it's not pointing to anything that Officer Grant did. And we can't say that anything that Officer Grant did caused Mr. Lewis's death when the medical examiner can't determine what caused his death. So I think that fact, which is undisputed, the medical examiner's determination or conclusion is in the pleadings and it's in the evidence. I think that is as significant as anything. I mean, we go to then as a factual matter. But back to your question about the cases, this is a 14th Amendment pretrial detainee case. And I think it's important that we stay in that ballpark, if you will. Not in the ballpark of Fourth Amendment law, not in the ballpark of Eighth Amendment jail law, but the 14th Amendment pretrial detainee law. And there is a dearth of cases dealing with uses of force in that scenario, which is in the jail scenario, pretrial detainees trying to maintain institutional security, trying to maintain order, and responding to disturbances that would disrupt that. That's different than a police officer such as in the Tampa case. Officer Dillard was on his back for 14 minutes, and the video showed that. And it showed that perhaps that was unnecessary. I mean, this court reversed the grant of qualified immunity in that case as being not supported. But that's a Fourth Amendment case. It's unlike this case here. Ms. Grant was in the room for only two and a half minutes until he got handcuffed, and then she was out. So I don't think Tampa provides any good authority for it, even if you want to look at Fourth Amendment cases. But I think looking at Tampa and looking at Austin and looking at Bush and looking at Darden and looking at Trammell, all the cases that the other side has raised here to try to say that there was clearly established law, I think actually undermines the point. The point is, what Fourteenth Amendment clearly established law was there? And looking to Fourth Amendment cases, because you can't find any other Fourteenth Amendment cases, you can only find Fourth Amendment cases other than Simpson, I think underscores that there was no clearly established law here, and the district court was right, that there is no clearly established law that Officer Grant violated that would mean that she's not entitled to qualified immunity. The district court did discuss Kingsley and the Kingsley factors, but those factors are, I think, primarily important for the determination of what factually occurred. Kingsley actually focused on that mostly. Kingsley really didn't do much discussion or provide much discussion concerning the clearly established law prong, because that really wasn't the issue in that case. It just mentioned it. But Kingsley is a Supreme Court's law here, and so I think the district court's order on page 1279 of the record summarizes it well and summarizes why qualified immunity was applicable here. Now, I'll go to some of the statements made a few minutes ago and address some of those. Judge Ho talked about the neck hold in Simpson. I think that is a significant difference between this case and the Simpson case, because Officer Grant was nowhere near Mr. Lewis's head, neck, or chest area. And so that was . . . Not by Ms. Grant. Here we are. I mean, I'm not trying to minimize anything here, but I represent Officer Grant, not any of the other officers. So that the . . . I think the speculation that there was some sort of positional hypoxia here is not borne out by the evidence that was provided. And Judge Douglas, you asked for the best case. I think the cases that you provided were Fourth Amendment cases and not Fourteenth Amendment cases, including Tempa. In the Simpson case, again, those were factually different and did not provide Ms. Grant, as a matter of law, an indication or any kind of robust authority where reasonable minds could not differ on what she did. And I believe reasonable minds can differ. And because of that, she's entitled to qualified immunity. The testimony that was provided by Mr. Tavera, I will mention to the Court, is not strong. Because, number one, it's in the context of sort of an investigation by the Tarrant County Sheriff's Office. And I say it was sort of an investigation because none of the witnesses were ever put under oath. There were no garrity warnings given. There were very informal discussions. And so I don't believe that those provide the kind of testimony that would be helpful to establish anything. I objected to that evidence, but Judge Fitzwater overruled my objection without prejudice based upon granting the summary judgment motion. On page 842 of the record, Sergeant Shelton asked Mr. Officer Tavera, where was Ms. Grant? She was on top of the legs at first, lines 10 through 12. On that same page, line 19, I know she was on top of him, where? Right here on the legs, lines 19 through 22. Then, page 844 of the record, Sergeant Shelton, was anybody on top of Lewis Tavera? Well, like I say, Ms. Grant was on top of his legs, lines 4 through 7. Then, pages 849 and 850, these are the pages that were actually cited by the district court in its order, where Sergeant Shelton was asking Tavera, where all did Grant stand on him, starting on page 849, line 20. Tavera, I already told you, sir, she was on the legs. Sergeant Shelton, and he said she moved. Where did she move to? Lieutenant Kelly, did she move above his buttock area? He said, yeah, but I don't know exactly where she was standing. And that's where I think the evidence is weak. Continuing on, here on page 850, like she was just there, you know what I mean? And he, Lieutenant Kelly, Javier, I've been in a lot of, I understand, Lieutenant Kelly, places. It, Javier, I cannot tell you where she was. Lieutenant Kelly, I have not, I have never not had a recollection of an incident, especially a major incident like this that has a huge impact on you. Tavera, I understand. Lieutenant Kelly, like you have. Tavera, I understand, sir, but I'm not going to tell you, oh, she was there and there and there. I think what Judge Fetchwater did was give him the benefit of the doubt on that and said if the evidence can show that she was on, Officer Grant was on his legs, then we'll remove that disputed fact. That's the only disputed fact involving Officer Grant. Did a clearly established law prohibit that? I believe the answer is no. Therefore, when the answer is no, she's entitled to qualified immunity and didn't violate clearly established law. I'm going to yield the rest of my time unless the Court has any other questions for me. Thank you. Ms. Hayes. Thank you, Your Honor. I'd like to start off by addressing what our friend on the other side pointed out about Simpson and Judge Ho asked about as well. I want to remind the Court that in Simpson, the neck hold and beefcake sitting on, those were two different people. There were ten officers, and this Court found in 1990, and it's still good law, that all ten of them were liable for the excessive force. So just as in this case where the neck hold is one person and the person on his back is another, that's the same exact situation as in Simpson. He talked a lot about Fourth Amendment cases versus Fourteenth Amendment cases, and to be honest, from my point of view, the distinction between Fourth Amendment and Fourteenth Amendment cases actually cuts in our favor. If you think about it, when someone is out in the wild with an unrestrained person who may have a weapon and they have to make these kind of split-second decisions and you're still finding that unconstitutional, how much more so with a pretrial detainee who is unarmed and surrounded in a locked-down facility where there's no means for escape? And this Court has often referenced those two, Fourth Amendment and Fourteenth Amendment cases, back and forth. But again, Simpson v. Hines is a Fourteenth Amendment case directly on point. With respect to the testimony about him going above, originally he said, no, she was just standing on his legs, and then he did read the testimony where Tavares said, no, she went above his buttocks. I think that is very strong testimony, considering you've got a Dallas County employee who's the only one of the nine who is willing to admit that she's above his buttocks, is on his back, that she went above and he talked about how scared he was of losing his job. Officer Sawyer also stated in her interview that he had told her he saw Officer Grant on Mr. Lewis's back. She said that in the investigative interview, and then she said, oh, my gosh, I don't want to lose my job either. So the fact that we have two brave employees that are willing to stand up and say this happened, this was against our training, this was not right, this shouldn't have happened, also cuts against it. With respect to the undetermined finding on the medical report, again, Darn and Gutierrez state that we don't have to have, they speak against the fact that you don't have to have the asphyxiation written in there, and I would say that the proximity in this case between his death and what happened in that room is very compelling, and this Court has looked to proximity for those sort of causation issues in these cases before. In addition, on the Tempa case, while they may have been standing on the detainee longer, if somebody who outweighed me was standing on me for two and a half minutes, it doesn't take long to sustain crushing or epoxic injuries either. So in the end, we ask that you reverse and remand the District Court's grant of summary judgment to Officer Grant, and I'll cede the rest of my time, unless you have other questions. Okay, thank you. Thank you. The case is submitted.